## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **JERMAINE HOLMES,** )<br>    )<br>    **Plaintiff,** )<br>    )<br>        **v.** )<br>    )<br>    )<br>**v.** )<br>**THE UNIVERSITY OF NORTH** )<br>**CAROLINA, THE NORTH CAROLINA** )<br>**STATE UNIVERSITY, AND CARRIE** )<br>**DOYLE** )<br>    **Defendant.** ) | **COMPLAINT**<br>**(JURY DEMAND)** |

_____

      NOW COMES Plaintiff Jermaine Holmes ("Plaintiff" or "Mr. Holmes"), by and through undersigned counsel, Robert Lewis, Jr., complaining against the Defendant THE UNIVERSITY OF NORTH CAROLINA (individually "UNC" and collectively "Defendants"), a body politic and corporate institution of the State of North Carolina; and THE NORTH CAROLINA STATE UNIVERSITY (individually "NC-State" and collectively "Defendants"), a constituent institution of The University of North Carolina; alleges and says as follows:

      1.     Plaintiff is a citizen and resident of Wake County, North Carolina.

      2.     Defendant UNC is a body politic and corporate institution within the State of North Carolina that is organized and exists pursuant to N.C. Gen. Stat. 116-1, et seq. As such, Defendant UNC is a State institution that is empowered to sue and be sued.

      3.     Defendant NC-State is a constituent institution of Defendant UNC that is organized and exists pursuant to N.C. Gen. Stat. 116-4, et seq. As such, Defendant NC-State is a State institution that is empowered to sue and be sued.

1

4.    Defendant NC-State is located in Wake County, North Carolina.

5.    On information and belief, Defendant UNC is statutorily obligated to supervise the actions of administrators at NC-State and to ensure that NC-State and its managers, at all times comply with the law.

6.    On information and belief, Defendant UNC knew or should have known the acts, actions, or omissions to act, that NC-State through its managers took against Plaintiff in violation of §42 U.S.C. § 1981, 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, N.C. Gen. Stat. 126-84, et seq. ("N.C. Whistleblower Act"), Tortious Interference with a Contract, Negligent Supervision & Retention and Negligent Infliction of Emotional Distress but refused or otherwise failed to remediate such actions or omissions to act, as alleged herein.

<u>JURISDICTION AND VENUE</u>:

7.    The jurisdiction of this court is invoked over claims arising under 42 U.S.C. §1981, 42, U.S.C. §1983, the First and Fourteenth Amendments to the United States Constitution, N.C. Gen. Stat. 126-84, et seq. ("N.C. Whistleblower Act") and the common law torts of Tortious Interference with a Contract, Negligent Supervision, and Negligent Infliction of Emotional Distress.

**PRELIMINARY STATEMENT**

8.    This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful discrimination based on Plaintiff's race, color (black), and as well as Defendants' wrongful discharge of Plaintiff in violation of Plaintiff's Constitutional and state law rights. Plaintiff also complains and alleges that Defendant's

2

discharged him for participation in a protected activity when Plaintiff complained about illegal activity to Defendants' management.

<u>COMMON ALLEGATIONS</u>:

Plaintiff's Employment at NC-State

9.     Around March 3, 2014, Defendants hired Plaintiff as an Associate Athletics Director of Academics/Director of Academic Support Program for Student Athletes (hereinafter, "AAD").

10.     Upon hiring Plaintiff Defendants were aware that Plaintiff was an African American male.

11.     Prior to working for the Defendants Plaintiff had over 15 years of collegiate athletics experience working for Virginia Tech, The Ohio State University, and California State University, Fullerton.

12.     As an AAD, Plaintiff's job responsibilities were centered on managing a team of twenty-two full time staff members, and oversight over 110 indirect reports, all of whom assisted University athletes, including those who were high risk or had learning disabilities, so that they could succeed academically at the undergraduate level.

13.     Upon accepting employment, but prior to his start date, Plaintiff conducted a strengths, weakness, opportunities, and threats analysis also known by the acronym, "SWOT" analysis, to evaluate those four elements of the athletic department for planning purposes of achieving their stated goals. Plaintiff contacted his entire staff and asked them to participate.

14.     The SWOT analysis covered, among other things, student use of computers, whether new computers were needed, an upgrade of the facilities, more support for student athletes, hiring of learning specialist, and input regarding the proposed budget for the

3

department.

15.     As a result of the SWOT analysis and further evaluation of the Athletic

department Plaintiff learned that one of the men's basketball coach's daughter, Christine

Lutz was hired August 23, 2013, as tutor in violation of the NC-State's best practices and

conflict of intertest policies.

16.     Additionally, as a result of the SWOT analysis Plaintiff learned that

 interns were consistently working more than 60 hours a week and were getting

paid for only 40 hours in violation of federal labor laws.

17.     Upon information and belief, Christina Lutz, the Associate Head Basketball

Coach's daughter, was hired by Jody Moylon (hereinafter, "Moylon"), as tutor in

violation of the NC-State's best practices and conflict of intertest policies.

18.     On May 9, 2014, Plaintiff and Plaintiff's Administrative Assistant, Glenda

Johnson met with Defendant's Human Resource's representative to discuss converting

three intern positions to temporary administrative-office support staff positions.

19.     On June 16, 2014, Plaintiff met with Debbie Yow, Director of Athletics,

(hereinafter, "Yow"), Michael Liptz Deputy Athletics Director Internal Operations

(hereinafter, "Lipitz"), Diane Moose Senior Associate Athletics Director/CFO (hereinafter

"Moose"), to discuss Plaintiff's proposed budget.  During this meeting Plaintiff's emphasis

on the need  to keep three interns was rejected by Yow.

20.     On June 16, 2014, Yow wrote an email to Mullen informing him about a

meeting that she and Plaintiff attended, to discuss the Academic Support Program for

Student Athletes (hereinafter, "ASPSA") financial needs, informing Mullen that Plaintiff

was well prepared for the meeting, which helped facilitate discussions.

4

21.     On June 16, 2014, Plaintiff prepared a memorandum related to ASPSA

budget needs titled Priority, Description & Justification whereby he prioritized the needs of

the department in relevant part as follows:

    a.  **<u>Priority 1</u>**
       Since the fall of 2009, 60 student athletes have been admitted by way of special
       committee.  For the fall of 2014, an estimated 13-15 more will be admitted.  This
       would bring that growing number to 75.  This group would represent our most at-risk
       group of student athletes who have a varying degree of academic preparedness.
       Currently the Academic Support Program for Student Athletes does not have a
       specialist who can work with this population of students on a day to day regular basis.
       Our method of helping these young men and women is through our tutorial support
       program.  Using tutors is often a great way to supplement, however enlisting tutors to
       work with our most at risk student population is not a best practice.

    b.  **<u>Priority 2</u>**
       ASPSA currently employs 3 Assistant Coordinators (Interns) that provide critical
       support to football (2) and men's basketball (1) student athletes as well as the
       academic coordinators that work with those sports.  These Assistant Coordinators
       (Interns) also work day to day with our tutorial support program which provided well
       over 30,000 individual tutorial appointments for student athletes during the 2013-
       2014 academic year.  These employees work on average 50-60 hours per week.

22.     On or about October 21, 2014, Plaintiff met with Carrie Doyle (Senior

Associate Director of Compliance) to discuss the loss of three interns.  Doyle commented

that she was sure that Yow would have supported keeping interns had she known about

how valuable they were etc.  Plaintiff informed Doyle that Yow had all of the information

about the importance of the interns etc. Plaintiff emailed Doyle the original documentation

about ASPSA priorities that he shared with Athletics during the budget meeting Doyle

never responded.

23.     On or about October 24, 2014, Doyle requested that Plaintiff provide her

with a written plan as to how he plans to address the loss of three interns and

oversight/monitoring of tutors.

5

24. On or about October 25, 2014, Doyle provided Plaintiff with specific concerns that had been brought to her attention by Moylon (white female) that he needed to address in his written plan.

25. Prior to this, Moylon never voiced her concerns to Mr. Holmes nor had she ever provided Mr. Holmes with this particular list of concerns and it was only after Doyle presented them to Plaintiff in her email dated October 25, 2014, did Plaintiff receive actual notice of the Moylon's complaint and concerns.

26. On or about October 26, 2014, Plaintiff forwarded an email to Mullen, Moose, Lipitz, Yow, and Doyle, informing them that Moylon hired Christine Lutz, the daughter of Associate Head men's basketball coach, during academic year 2013-2014, one year prior to Plaintiff's arrival, and that Christine Lutz's hire may be in violation of Defendant's own best practices and conflict of intertest policies.

27. On or about November 3, 2014, pursuant to Doyle's request, Plaintiff submitted the *Tutor Oversight Report* (hereinafter, "Report") that detailed what he believed to be factors that could lead to integrity and NCAA issues and violations.

28. On or about November 4, 2014, Plaintiff conducted a staff meeting where he addressed his staff regarding the improper hiring of Christine Lutz, the daughter of the Associate Head men's basketball coach.

29. On or about November 19, 2014, Plaintiff met with Dr. Joanne Woodard, Vice Provost of Institutional Equity and Diversity, to discuss his concerns about unfair and unequal treatment from Doyle regarding staff complaints and false representations.

30. On or about November 25, 2014, Plaintiff emailed Mullen expressing concerns about what he felt was unfair and unequal treatment he was receiving related to

6

certain false representations being reported to management about Plaintiff's leadership.

31. On or about December 1, 2014, Plaintiff met with Mullen, Yow, Doyle and Roby Sawyers (Faculty Athletics Representative), and to discuss the Tutor Oversight Report in detail. The meeting, specifically focused on the fact that Plaintiff created the Report and emailed it out, as such report "could" be perceived as if the athletic department was not properly supporting its student athletes. Yow publicly expressed her frustrations with Plaintiff for emailing the document and she was visibly upset about Plaintiff emailing the Tutor Oversight Document. Yow explained that she would never send an email out containing such information, and illustrated her point by providing an example how she would handle such a matter, by stating "if she had a similar problem, she would certainly not email her boss, Chancellor Woodson, but would meet with him directly or call him to discuss the matter."

32. Plaintiff contends that during the December 1, 2014, meeting he was disciplined in the form of a verbal reprimand by management for drafting and emailing the Tutor Oversight Report.

33. On or about April 9, 2015, Plaintiff met with Mullen and Dan O'Brien, where, without any prior warning that his position was in jeopardy, Plaintiff was informed that he was being removed from his role as Director of ASPSA.

34. On or about April 13, 2015, Mullen announced that Katie Sheridan (white female) and one of Plaintiff's direct reports, was named the Interim Director of ASPSA.

35. On or about April 28, 2015, Plaintiff met with Dr. Joanne Woodard, for a second time, to discuss his discriminatory and disparate treatment and how he had been forced out of his position without any prior notice or warning.

36. On or about August 4, 2015, Mullen announces that Katie Sheridan has accepted his offer for the Assistant Dean and Director for Academic Support Program for Student Athletes.

37. Plaintiff asserts that due the fact that he addressed pressing deficiencies related to the academic improvement of student athletes, and that such deficiencies illustrated how the Defendants could be considered in violation of NC-State's best practices and conflict of intertest policies as well as NCAA violations, he was removed from his AAD position and subsequently discharged.

38. Plaintiff contends that Yow informed him that he should not have sent the Report by email, and if he had any concerns with ASPSA he should have gone to Mullen's office and addressed them directly with Mullen in the meeting but not in writing. Yow continued on and stated that the information as written in his memo would not have been something she would have emailed to her boss, but would have had a face to face discussion instead.

39. Plaintiff asserts that he had a meeting with the human resource department to discuss Defendants integrity issues, including a problem with their interns, whom were working over 60 hours a week and only getting paid for 40 hours a week. Additionally, Plaintiff informed human resources, like he did in his budget memorandum, that there were several deficiencies related to student athletes, but they all could be resolved if the Defendants hired two more learning specialist and allowed the interns who were currently working to be classified as temporary administrative office support staff instead of hourly employees.

40. Around October 2014, Plaintiff also contacted several staff members regarding

his perceived violation of NC-State's best practices and conflict of intertest policies, including Albidrez, Moylan, and Sheridan, to discuss who authorized the hiring of Ms. Christine Lutz, even though she was the daughter of the Associate Head Basketball Coach and why no one took action to remedy the perceived integrity issues including the violation of NC-State's best practices, and conflict of intertest policies.

41. Plaintiff called a staff meeting and again addressed his concern with his direct reports including Albidrez, Moylan, and Sheridan about the perceived integrity issues including the violation of NC-State's best practices, and conflict of intertest policies.

42. On February 4, 2015, Plaintiff had a meeting with Mullen, when for the first time, he was informed that since October 2014, there were a variety of issues that have arisen that have led to concerns from Compliance, Athletics and from within ASPSA.

43. During the February 4, 2015, meeting Mullen informed Plaintiff that Compliance was concerned that he was not always on top of important issues, without explaining what issues, that reporting was not complete, without explaining what reporting was incomplete, and that he was not always responsive, without explaining who complained about his lack of responsiveness and the specifics of the complaint.

44. During the February 4, 2015, meeting Mullen, informed Plaintiff about staff concerns around lack of communication and engagement with direct reports, not working closely with Associate Directors, failure to conduct staff meetings and lack of one on one staff contact.

45. Plaintiff asserts that Mullen admits, in a memo summarizing the meeting held on February 4, 2015, that they did not go in depth on the issues at the meeting.

46. Mullen stated in his memo summarizing the February 4, 2015, meeting that

9

Plaintiff needed to make sure he was enforcing academic policy, that the learning specialist at the expense of interns, at a time when staff was not at full strength became a major issue that caused stress on staff and Athletics. However, in the next sentence of the memo, Mullen states that "bringing in learning specialist was an exceptional idea that he fully supported. But now that they have specialist and interns the concern of course should be muted."

47. In the same memo dated February 4, 2015, Mullen informed Plaintiff, for the first time, that Plaintiff's staff perceived Plaintiff as not wanting to fully engage with the Office of Student Conduct regarding the issue of a student athlete who was accused of academic dishonesty. Furthermore, Mullen wrote that this singular issue has been a crystallizing with Plaintiff's staff.

48. Plaintiff asserts that after he attended the management meeting with Yow, Mullen and Doyle, where he pointed several integrity issues and deficiencies within ASPSA and his staff meeting with Albidrez, Moylan, and Sheridan, he began to be treated differently.

49. Plaintiff contends that Moylan went to Doyle and stated that because Plaintiff suggested that ASPSA replace interns with specialist, and Defendants agreed to replace interns with specialist, Defendants chances for academic misconduct increased.

50. Plaintiff contends that Doyle, without any corroboration started an investigation into Moylan's complaint, without first verifying the veracity of her statements.

51. Plaintiff asserts that Doyle complained to Mullen about Plaintiff leaving the Wainstein Report meeting early in an effort to make Plaintiff look bad, when in fact Plaintiff attended the same meeting during the Head Coaches meeting. Plaintiff did not

report to Doyle. Doyle never informed Mullen that Plaintiff attended the Head Coaches meeting where Doyle reviewed the Wainstein Report again.

52. On November 25, 2018, Mullen informed Plaintiff that Doyle reported that Plaintiff provided Yow with incomplete reports, which Yow used during a presentation at the Council of Athletics meeting on November 21, 2014. Mullen further stated that Doyle said the Plaintiff completed an incomplete report which embarrassed Yow at the Council on Athletics meeting.

53. Plaintiff avers that Doyle misrepresented to Mullen and upper management on several occasions including but not limited to the following: (a) informing Mullen that Plaintiff completed the report that Yow utilized at the Council on Athletics meeting; (b) informing Mullen that Plaintiff left the Wainstein Report meeting early insinuating that Plaintiff skipped out on the very import Wainstein Report meeting; (c) informing Mullen, that Plaintiff, provided her with erroneous information regarding the women's golf team graduation rates for the 2014 Cohorts, even though she was aware that multiple ASPSA, Athletic Compliance and University employees compiled the information for the 2014 Cohort report; (d) and informing Mr. Sherard Clinkscales, Plaintiff's immediate supervisor, that Plaintiff did not provide dates for her department to be included in the "Important Dates" calendar completed by Plaintiff, when in fact, Doyle refused to respond to Plaintiff's email requesting information regarding Doyle's department's important dates, even though, Michelle Lee, an employee in Doyle's department emailed Plaintiff informing him that the compliance department did not have any important dates to be included in the "Import Dates" calendar; and (e) reporting to the Chancellor that having Plaintiff in the AAD position would cause the school to risk being sanctioned by the NCAA.

11

## FIRST CAUSE OF ACTION
## SECTION 1981 OF THE CIVIL RIGHTS ACT
## RACE DSICRIMINATION AND RETALIATION

54. Plaintiff re-alleges by reference each and every allegation contained in Paragraphs 1 through 53 and incorporates the same herein as though fully set forth.

55. Plaintiff is an African American male, a protected class under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

56. At all times relevant to this Complaint, Defendants allowed Plaintiff to be discriminated against, harassed and subject to a hostile work environment because of his race.

57. Defendants removed Plaintiff from his position and replaced with a non-African American employee. Defendants treated Plaintiff less favorably than similarly situated employees who are non-African American.

58. Defendants discriminated against Plaintiff on the basis of race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1983.

59. Plaintiff contends that when he sent an email that included Mullen, Yow, Doyle, explaining that Moylon hired the associate head men's basketball coach's daughter (Christine Lutz) to tutor athletes for an entire year prior to his arrival. Sheridan, Moylon and Albidrez were involved in the hiring of the men's basketball coach's daughter but neither were disciplined, accused of lacking integrity or had their integrity questioned.

60. Plaintiff asserts that both Mullen and Doyle disciplined him and constantly called into question his integrity. Additionally, both Mullen and Doyle sent memos to the Chancellor of the institution expressing unfounded concerns about Plaintiff's integrity Plaintiff was removed from his position because of his integrity. Neither Mullen or Doyle sent any written

12

communications to the Chancellor questioning Moylon, Sheridan, or Albidrez's (all white females), integrity nor were any of them reprimanded.

61.   Plaintiff asserts that he did not receive training or coaching like his non-African American Counter-parts including Moylon, Albidrez and Sheridan.

62.  Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory practices unless and until the Court grants relief.

63.  Defendants violated Plaintiff's right to enjoy all the benefits, privileges, terms and conditions of his contractual relationship with the Defendants, in direct violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

64. Defendant NC-State discriminated against Plaintiff on the basis of his race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 by denying him the same terms and conditions of employment available to employees who are non-African American, including but not limited to, subjecting him to disparate working conditions, unfair discipline and denying him the opportunity to work in an employment setting free of unlawful harassment.

65. Defendant NC-State has discriminated against Plaintiff on the basis of his race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, work place harassment by senior management, supervisors and other employees; not affording Plaintiff the rights that are afforded to other who are non-African American as set forth in the Defendants' employee handbook policy and

13

procedures manual, when the Defendants failed to adhere to its policy and procedure manual to protect the Plaintiff.

66. Plaintiff alleges as a direct and proximate result of Defendants unlawful and discriminatory conduct in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief. Defendant's unlawful and discriminatory conduct in violation of Section 1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
(42 U.S.C. 1983-Retaliation for
Exercise of First Amendment Rights)

67. The foregoing allegations are hereby realleged and fully incorporated herein by reference as if fully set forth herein.

68. As alleged in the preceding paragraphs, Plaintiff informed sent out an email to Mullen, Yow, Moose and others truthfully and accurately informing them of his personal knowledge about the inappropriate, illegal, and/or corrupt practices by NC-State.

69. Plaintiff also discussed with numerous friends, family members and co-workers his concerns about how is co-workers authorized the hiring of children of the coaching staff, interns working in excess of sixty (60) hours while only paying them for forty (40) hours. The reports that Plaintiff published to the public and NC-State employees, were discussed truthfully and accurately to his personal knowledge, including matters related to inappropriate, unethical,

14

and illegal, and corrupt services that NC-State faculty and/or staff would provide to NC -State athletes, particularly those in the revenue" sports (collectively "athletic academic concerns").

70.  When Plaintiff spoke publicly and to members of the public about his Athletic academic concerns, Plaintiff was speaking as a citizen upon matters of public concern, as evident by the news coverage, of NCAA basketball programs, including NC-State.

71. At all times relevant herein, Plaintiffs interests in speaking upon the matters of public concern, as alleged herein, outweighed Defendants' interests in managing its working environment.

72. On information and belief, Plaintiffs speaking as a citizen upon matters of public concern, as alleged herein, were a substantial factor in Defendants' decisions to:

    a.    demote Plaintiff in rank and title effective April 9, 2016;

    b.    unfairly discipline and discharge Plaintiff;

    c.    reassign Plaintiff to substandard office space and equipment;

    d.    fail to take prompt and effective remedial action to address Plaintiffs grievances and the factors behind the hostile work environment that Plaintiff faced on a daily work basis; and

    f.    in such other and further ways as may be proven at trial.

73. As a direct and proximate result of Defendants' acts of reprisal against Plaintiff, as alleged herein, Plaintiff has incurred and sustained harms, losses and other damages in an amount to be determined at trial, but in excess of $75,000.00.

**THIRD CAUSE OF ACTION**
**EQUAL PROTECTION PURSUANT TO**
**THE FOURTEENTH AMENDMENT**

74. Plaintiff re-alleges by reference each and every allegation contained in Paragraphs 1 through 73 and incorporates the same herein as though fully set forth.

75. Plaintiff, an African American male, was denied equal protection under color of law on the basis of his race by Defendant, a Federal entity founded pursuant to the law of the North Carolina and United States Constitution and the Federal Government is a state actor.

76. At all times relevant to this Complaint, the Defendants singled Plaintiff out by his race as an African American male.

77. Defendant treated Plaintiff less favorably than similarly situated employees who are Non-black.

78. Plaintiff was threatened, slandered, subjected to heightened scrutiny, negative evaluations, demoted, change in job duties, harassed, subject to a hostile work environment, subject to unwarranted discipline and discharged by the Defendant.

79. Defendant discriminated against Plaintiff on the basis of his race in violation of the Fourteenth Amendment.

80. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory practices unless and until the Court grants relief.

**FOURTH CAUSE OF ACTION:**
**(Tortious Interference with Contract)**

81. Plaintiff realleges the allegations contained in paragraphs 1 – 80 and incorporates the same by reference as if fully set forth herein.

82. Plaintiff had an oral contract with Defendants.

83. Plaintiff alleges that Doyle as an insider to Plaintiff's valid oral contract with NC-State, knew of said valid oral contract of employment between Plaintiff and NC-State.

16

84. Mullen, Yow and Doyle intentionally and tortuously induced NC-State not to perform pursuant to Plaintiff's valid oral contract of employment with NC-State solely for improper purposes motivated by racial discrimination and retaliation.

85. Plaintiff alleges that the discharge occurred because the Defendants retaliated against Plaintiff due to Plaintiff's complaint to Human Resources at based on racial discrimination.

86. NC-State and its employees, Mullen, Yow and Doyle, acted with malicious intent, legal malice and without legal justification when they induced NC-State not to perform based on Plaintiff's valid oral contract of employment with NC-State.

87. NC-State and its employees' unjust interference with Plaintiff's valid oral contract of employment with NC-State caused injury and damage to the Plaintiff.

88. NC-State ratified the tortious conduct of its employees, Mullen, Yow and Doyle, and NC-State had knowledge of all material facts and circumstances related to its employees' tortious conduct. As a result of NC-State's ratification of said tortious conduct by its employees, NC-State failed to act to protect the Plaintiff's employment rights and ratified its employees' tortious interference with Plaintiff's contractual rights with NC-State.

89. The facts alleged above constitute Doyle's tortious conduct interfering with Plaintiff's valid contractual rights with NC-State without any legal justification. By reason of said tortious conduct by the Defendants, Plaintiff has suffered actual damages. Plaintiff is entitled to recover compensatory damages against said Defendants for past and future loss of earnings and benefits, and past and future mental and emotional distress, great worry, anxiety, and depression for a sum in excess of Twenty-five Thousand Dollars ($25,000.00).

17

90. The facts alleged above constitute actions by Defendants which were willful, wanton, malicious, and in total disregard of the rights of Plaintiff. Defendants are liable for punitive damages. Nc-State condoned its employees' tortious misconduct interfering with Plaintiff's valid employment contract with NC-State and its employees are individually and severally liable for punitive damages. Said Defendants are required to respond in punitive damages on account of said tortious conduct for a sum in excess of Twenty-five Thousand Dollars ($25,000.00).

## FIFTH CAUSE OF ACTION:
### (Negligent Supervision & Retention)

91. Plaintiff realleges the allegations contained in paragraphs 1 – 90 and incorporates the same by reference as if fully set forth herein.

92. Defendant NC-State knew or should have known of the pervasive and severe employment practices encouraged by upper management in the Athletics Department.

93. Defendant NC-State has a duty to the public and its employees to hire, supervise promote, and retain persons competent and fit to perform their job duties without violating rights of other employees.

94. Defendant NC-State has a duty to investigate the suitability and record of persons it hires, particularly those in upper management.

95. Defendant NC-State has a duty to investigate the suitability and record of persons it promotes, particularly when the promotion bestows authority over employees.

96. Upon receiving complaints of illegal and discriminatory practices and disciplinary actions that violated Defendant NC-State's own policies, Defendant had a duty to investigate the allegations and take steps to prevent employees such as Plaintiff form having their rights violated.

97. Defendant NC-State failed to adequately investigate claims of wrongdoing, discrimination and targeting of individuals by Defendant's management.

98. Defendant NC-State failed to investigate the repeated false allegations by its employees and subsequent disciplinary actions taken against Plaintiff and to protect him from racial discrimination and retaliation.

99. Defendant NC-State has a duty to adequately supervise its employees.

100. Defendant NC-State failed to adequately supervise its employees.

101. As a proximate and foreseeable result of the conduct and omissions of Defendant NC-State that allowed Defendant's employees to continually harass and discriminate against Plaintiff on the basis of his complaints to management about certain illegal behavior and his race, Plaintiff was injured as alleged.

## SIXTH CAUSE OF ACTION:
### (Negligent Infliction of Emotional Distress)

102. Plaintiff realleges the allegations contained in paragraphs 1 – 101 and incorporates the same by reference as if fully set forth herein.

103. Plaintiff asserts that the Defendants by and through their egregious behavior negligently inflicted emotional distress when it retaliated against, wrongfully removed and terminated Plaintiff.

104. Defendants had a duty to act in good faith and fair dealings with Plaintiff during their employer-employee relationship.

105. Defendant NC-State as Plaintiff's employer had a duty not to retaliate and or discriminate against Plaintiff in its employer-employee relationship because of Plaintiff's race/color.

19

106. Defendants had a duty to operate in good faith and fair dealings with Plaintiff during their employer-employee relationship and the Defendant breached its duty when it retaliated and wrongfully terminated Plaintiff without just cause or providing Plaintiff with any notice that his job performance or work conduct was unsatisfactory, for engaging in protected activity.

107. Defendant NC-State, as Plaintiff's former employer had a duty to act in good faith and fair dealings with Plaintiff during the course of their employer-employee relationship and the Defendant NC-State breached its duty when it discriminated, retaliated, and wrongfully terminated Plaintiff because of his race/color and participating in protected activity.

108. Plaintiff's reputation in the business community has been harmed, and continues to be harmed, by the Defendant due to the fact that the Defendant is providing negative employment references related to Plaintiff's potential employment opportunities.

109. Plaintiffs asserts Defendant's egregious actions have caused him to suffer and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, insomnia, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

## JURY DEMAND

110. Plaintiff realleges the allegations contained in paragraphs 1 – 109 and incorporates the same by reference as if fully set forth herein.

111. Plaintiff hereby requests and demands a trial by jury on all issues properly admissible to a jury.

## PRAYER FOR RELIEF

**WHISEFORE**, Plaintiff respectfully prays that the Court award judgment in favor of the Plaintiff for Defendants' violation of Federal discrimination laws and Tortious Interference with Contractual Rights, Negligent Supervision and Retention, Negligent Infliction of Emotional Distress and award Plaintiff the following:

a. Actual and consequential damages as may be proven, plus interest, including, but not limited to, back pay and benefits, as well as compensation for loss of past, present, and future employment income and opportunities;

b. Compensatory damages as may be proven at trial, including, but not limited to, compensation for the emotional distress, pain, suffering, and humiliation that Plaintiff suffered as a result of the Defendants' unlawful actions;

c. Punitive damages payable to Plaintiff in an amount to properly penalize the Defendants for their tortious conduct and to deter such wrongdoing in the future;

d. Such further relief as the Court deems in its discretion to be just and proper; and

e. Trial by jury.

This the 9th day of April 2018.

The Lewis Law Firm, P.A.

/s/Robert Lewis, Jr,
ROBERT LEWIS, JR.
Attorney for Plaintiff
NC State Bar # 35806
555 Fayetteville Street
 Suite 201
Raleigh, North Carolina 27601
Telephone: 919. 719-3906
Facsimile:  919-573-9161
rlewis@thelewislawfirm.com
