IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CV-150-D

| | | |
|---|---|---|
| JERMAINE HOLMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| THE UNIVERSITY OF NORTH CAROLINA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

On September 28, 2018, Jermaine Holmes ("Holmes" or "plaintiff") filed an amended complaint against The University of North Carolina ("UNC"), North Carolina State University ("NC State"), Carrie Doyle ("Doyle"), and Michael Mullen ("Mullen"; collectively "defendants") [D.E. 22]. On November 27, 2018, defendants moved to dismiss for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted [D.E. 30] and filed a memorandum in support [D.E. 31]. On January 7, 2019, Holmes responded in opposition [D.E. 33]. On January 18, 2019, defendants replied [D.E. 34]. As explained below, the court grants defendants' motion to dismiss.

I.

On March 3, 2014, NC State hired Holmes, an African American male, for the position of Associate Athletics Director ("AAD") and Director of Academic Support Program for Student Athletes ("ASPSA"). See Am. Compl. [D.E. 22] ¶¶ 11–12. Holmes managed 22 full time staff members and oversaw over 110 individuals who provided academic assistance to NC State athletes. See id. ¶ 14. Before starting at NC State, Holmes reviewed the state of the athletic department and

conducted a strengths, weaknesses, opportunities, and threats analysis ("SWOT" analysis). See id. ¶¶ 15–16. As part of Holmes's SWOT analysis, Holmes discovered that NC State hired Christine Lutz ("Lutz"), the daughter of NC State's Associate Head Men's Basketball Coach, as a tutor. See id. ¶¶ 17, 19. Holmes believed that hiring the daughter of a basketball coach violated "NC State's best practices and conflict of inter[est] policies." Id. ¶ 17. Holmes also learned that interns consistently worked more than 60 hours per week but were paid for only 40 hours of work, which Holmes believed violated state and federal labor laws. See id. ¶ 18.

On May 9, 2014, Holmes and his administrative assistant met with representatives of NC State's human resources department. See id. ¶ 20. Holmes discussed "converting three intern positions to temporary administrative-office support staff positions" and raised "several integrity issues and deficiencies within ASPSA." Id. ¶¶ 20, 50. On June 16, 2014, Holmes met with Debbie Yow ("Yow"), NC State's Director of Athletics, and others to discuss Holmes's proposed budget. See id. ¶ 21. After the meeting, Yow e-mailed Mullen to inform him about the meeting and stated that Holmes was "well prepared for the meeting." Id. ¶ 22. On the same day, Holmes also prepared a memorandum concerning ASPSA budget needs titled "Priority, Description, & Justification." Id. ¶ 23. Holmes alleges that, following the meeting with Yow, he began to be treated differently. See id. ¶ 50.

On October 21, 2014, Holmes met with Doyle, the Senior Associate Director of Compliance, to discuss "the loss of three interns." Id. ¶ 24. On October 24, 2014, Doyle asked Holmes to provide her with a written plan explaining how he would address the loss of three interns and oversight of tutors. See id. ¶ 25. On October 25, 2014, Doyle provided Holmes with specific concerns of Jody Moylon ("Moylon") that Holmes needed to address in his plan. See id. ¶¶ 26–27. Holmes alleges that Moylon told Doyle that replacing interns with academic specialists would increase the risk of

2

academic misconduct. See id. ¶ 51. Holmes also alleges that Doyle began to investigate Moylon's claims "without first verifying the veracity of her statements." Id. ¶ 52.

On October 26, 2014, Holmes forwarded an e-mail to Mullen, Doyle, Yow, and other athletics staff members informing them that Moylon hired Lutz in 2013 and that, in doing so, Moylon may have violated NC State's best practices and conflict of interest policies. See id. ¶¶ 28, 42. Holmes asked several staff members why "no one took action to remedy the perceived integrity issues." Id. ¶ 42. On November 3, Holmes submitted a report to Doyle, titled "Tutor Oversight Report" (the "Report"), that "detailed what [Holmes] believed to be factors that could lead to integrity and NCAA issues and violations." Id. ¶ 29. On November 4, 2014, Holmes held a staff meeting at which he addressed hiring Lutz. See id. ¶¶ 30, 43.

On November 19, 2014, Holmes met with Dr. Joanne Woodard, NC State's Vice Provost of Institutional Equity and Diversity, "to discuss his concerns about unfair and unequal treatment from [Doyle] regarding staff complaints and false representations." Id. ¶ 31. On November 25, 2014, Mullen informed Holmes that he received a report from Doyle indicating that Holmes had provided Yow with incomplete reports, which Yow had then used for a presentation on November 21, 2014. See id. ¶ 54. On November 25, 2014, Holmes e-mailed Mullen "expressing concerns about what [Holmes] felt was unfair and unequal treatment . . . related to certain false representations being reported to management about [Holmes's] leadership." Id. ¶ 32.

On December 1, 2014, Holmes met with Mullen, Yow, Doyle, and a faculty athletics representative to discuss the Report. See id. ¶ 33. Yow was frustrated with Holmes for e-mailing the Report because the Report contained sensitive information that could be interpreted as "the athletic department . . . not properly supporting its student athletes." Id. Holmes alleges that, during the meeting, management formally disciplined him with a verbal reprimand. See id. ¶ 34.

3

On February 4, 2015, Holmes met with Mullen, who informed Holmes about numerous issues with his performance. See id. ¶ 44. Mullen noted that Holmes "was not always on top of important issues, . . . that reporting was not complete, . . . and that [Holmes] was not always responsive." Id. ¶ 45; see id. ¶ 46. Holmes alleges that meeting was the first time that anyone raised performance issues with him. See id. ¶ 44. Mullen summarized the meeting in a memorandum for Holmes. See id. ¶¶ 47–49. In the memorandum, Mullen suggested that the "singular issue" with Holmes's performance was Holmes's perceived reluctance to engage with the Office of Student Conduct concerning a student athlete accused of academic dishonesty. See id. ¶ 49.

On April 9, 2015, Holmes met with Mullen and Dan O'Brien, and Mullen told Holmes that he was being removed from his role as Director of ASPSA. See id. ¶ 35. Later, defendants discharged Holmes. See id. ¶ 39. On April 13, 2015, Mullen named Katie Sheridan ("Sheridan"), a white woman, interim Director of ASPSA. See id. ¶ 36. On August 4, 2015, Sheridan became the Assistant Dean and Director for ASPSA. See id. ¶ 38.

On April 28, 2015, Holmes met with Dr. Joanne Woodard again to discuss "his discriminatory and disparate treatment and how he had been forced out of his position without any prior notice or warning." Id. ¶ 37. Holmes alleges that Doyle made numerous misrepresentations to Mullen concerning Holmes's performance. See id. ¶ 55.

On April 9, 2018, Holmes filed a complaint against defendants [D.E. 1]. On September 28, 2018, Holmes filed a first amended complaint against defendants [D.E. 22]. Holmes alleges six claims: (1) disparate investigation and disparate discipline in violation of 42 U.S.C. § 1981, (2) retaliation in violation of 42 U.S.C. § 1983, (3) denial of equal protection under the Fourteenth Amendment, (4) tortious interference with contract, (5) negligent supervision and retention, and (6)

4

negligent infliction of emotional distress. See id. ¶¶ 56–112. Holmes seeks compensatory damages and punitive damages. See id. at 22.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

The motion to dismiss requires the court to consider the plaintiffs' state-law claims, and the parties agree that North Carolina law applies. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp.,

817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[1] In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue that it has not yet resolved, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

### III.

As for Holmes's claims against Mullen and Doyle, Holmes fails to allege a claim against Mullen or Doyle in their individual capacities. "[T]he mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action." Adams v. Ferguson, 884 F.3d 219, 225 (4th Cir. 2018) (quotation omitted); see Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 543 (1986). Nothing in Holmes's complaint, besides labeling the suit as against Mullen and Doyle in their official and individual capacities, suggests that he intends to sue Mullen and Doyle in their individual capacities. Accordingly, the court dismisses Holmes's claims against Mullen and Doyle in their individual capacities.

---

[1] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

As for Holmes's claims against UNC, Holmes fails to allege that UNC was involved in the dispute. Thus, Holmes does not plausibly allege any claim against UNC. Accordingly, the court dismisses Holmes's claims against UNC.

Holmes first alleges disparate investigation and disparate discipline in violation of 42 U.S.C. § 1981. See Am. Compl. [D.E. 22] ¶¶ 56–68. "[T]he express cause of action for damages created by [section] 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in [section] 1981 by state governmental units . . . ." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989); see Dennis v. Cty. of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995); Everett v. Redmon, No. 7:16-CV-323-D, 2017 WL 2313468, at *4 n.3 (E.D.N.C. May 26, 2017) (unpublished); White v. Gaston Cty. Bd. of Educ., No. 3:16-CV-552-MOC-DSC, 2017 WL 220134, at *4 (W.D.N.C. Jan. 18, 2017) (unpublished). Holmes cannot bring a "freestanding" claim under section 1981 against NC State or against Mullen and Doyle in their official capacities. White, 2017 WL 220134, at *4. Accordingly, the court grants defendants' motion to dismiss Holmes's first claim.

Second, Holmes alleges retaliation under 42 U.S.C. § 1983 based on Holmes's exercise of his First Amendment rights. See Am. Compl. [D.E. 22] ¶¶ 69–75. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989); see Hafer v. Melo, 502 U.S. 21, 27 (1991). "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." Will, 491 U.S. at 70; see DeCecco v. Univ. of S.C., 918 F. Supp. 2d 471, 505–06 (D.S.C. 2013); Googerdy v. N.C. Agric. & Tech. State Univ., 386 F. Supp. 2d 618, 625 (M.D.N.C. 2005). NC State, as part of North Carolina's university system, is "an alter ego" of the state of North Carolina. Googerdy, 386 F. Supp. 3d at 625. Similarly, Mullen and Doyle, as employees of NC State, are state officials. Defendants are therefore not "persons" for purposes of

7

section 1983. See Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1139 n.6 (4th Cir. 1990); Joy v. Univ. of N.C. at Wilmington, No. 7:09-CV-136-BO, 2010 WL 2024094, at *1 (E.D.N.C. May 19, 2010) (unpublished). Alternatively, because North Carolina has not waived Eleventh Amendment immunity for section 1983 suits, the Eleventh Amendment bars Holmes's section 1983 claim against NC State. See, e.g., Will, 491 U.S. at 71; Joy, 2010 WL 2024094, at *1. Accordingly, the court grants defendants' motion to dismiss Holmes's second claim.

Third, Holmes alleges a violation of the Equal Protection Clause of the Fourteenth Amendment. See Am. Compl. [D.E. 22] ¶¶ 76–82. "The Fourteenth Amendment does not create a direct cause of action." Costello v. Univ. of N.C. at Greensboro, 394 F. Supp. 2d 752, 759 (M.D.N.C. 2005); see Hughes v. Bedsole, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995); cf. Maisha v. Univ. of N.C., No. 1:12-CV-371, 2013 WL 1232947, at *2 (M.D.N.C. Mar. 27, 2013) (unpublished), aff'd, 641 F. App'x 246 (4th Cir. 2016) (per curiam) (unpublished). Even if Holmes intended to bring his claim under section 1983, defendants are not "persons" for the purpose of section 1983. Accordingly, the court grants defendants' motion to dismiss Holmes's third claim.

As for Holmes's state law claims, "the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court." Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 540–41 (2002); see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120–21 (1984). "And for purposes of the Eleventh Amendment, a state official acting in his official capacity is protected from a damages action by the same immunity." Ballenger v. Owens, 352 F.3d 842, 845 (4th Cir. 2003); cf. Will, 491 U.S. at 70–71. Indeed, Holmes does not challenge defendants' argument that the Eleventh Amendment bars Holmes's state law claims. See [D.E. 33] 18. Accordingly, the court grants defendants' motion to dismiss Holmes's state law claims.

IV.

In sum, the court GRANTS defendants' motions to dismiss [D.E. 30] and DISMISSES Holmes's first amended complaint without prejudice.

SO ORDERED. This 2 day of May 2019.

J. Dever

JAMES C. DEVER III
United States District Judge